21-2742-Exhibit A

**AFFIDAVIT OF DUSTIN POULIN**

I, Special Agent Dustin Poulin, being duly sworn, depose and state that:

**INTRODUCTION**

1.      I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since June 2015, and I am currently assigned to FBI's Boston Field Office, specifically the North Shore Gang Task Force ("NSGTF"). I was previously assigned to the FBI Philadelphia Division, South Jersey Violent Offender and Gang Task Force, in Cherry Hill, New Jersey. As an FBI Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of the federal narcotics laws in Title 21 of the United States Code. Prior to becoming a Special Agent, I served with the FBI since December 2009 as an Operation Support Technician and Staff Operations Specialist in the FBI Boston Division, Boston, Massachusetts. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2.      As an FBI Special Agent, I have participated in narcotics investigations and debriefed or participated in the debriefings of defendants, informants, and witnesses who had personal knowledge of narcotics trafficking and gang organizations. I have participated in many aspects of narcotics investigations, including conducting physical and electronic surveillance, analyzing telephone toll information obtained through subpoenas, analyzing information obtained through court-ordered pen registers and trap and trace intercepts, overseeing the activities of and debriefing confidential human sources, and executing arrest and search warrants. I have coordinated controlled purchases of illegal drugs utilizing confidential sources and cooperating witnesses. I have interviewed admitted drug traffickers, drug users, informants, cooperating defendants, and local, state, and federal law enforcement officers regarding the manner in which

1

drug traffickers distribute, obtain, finance, store, manufacture, transport, and distribute illegal drugs, including heroin, fentanyl, cocaine, and cocaine base. As such, I am familiar with the methods, routines, and practices of individuals involved in the use, sale, and trafficking of narcotics. I am also familiar with the various paraphernalia used to manufacture, compound, process, deliver, dispense, import and export, and use controlled substances such as methamphetamine, fentanyl, heroin, cocaine, marijuana, prescription medications, and other controlled substances. Based on my training and experience, I am familiar with the appearance, packaging, and texture of many controlled substances, including heroin, fentanyl, cocaine, and cocaine base.

3.      Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities. However, drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information. I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance. I am familiar with the manner in which narcotics traffickers use telephone, coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of phone calls to avoid speaking over the telephone. I am familiar with the "street" language used by drug traffickers, as well as the methods they use to disguise conversation and operations.

4.      Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities. I am familiar with the manner in which narcotics traffickers use telephone, coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection. I am familiar with the "street" language used by drug traffickers, as well as the methods they use to disguise conversation and operations.

## PURPOSE OF AFFIDAVIT

5.      I am submitting this affidavit in support of:

    a.      An application for the issuance of a search warrant authorizing the search of 39 Forest Acres Drive, Apartment 39A, Haverhill, Massachusetts (hereinafter, "Target Location 1").  A complete description of the property to be searched is set forth in Attachment A-1, which is attached hereto and incorporated herein;

    b.      An application for the issuance of a search warrant authorizing the search of 71 Jackson Street Extension, Apartment 1, Haverhill, Massachusetts (hereinafter, "Target Location 2").  A complete description of the property to be searched is set forth in Attachment A-2, which is attached hereto and incorporated herein; and

    c.      An application for the issuance of a search warrant authorizing the search of 96 Richardson Road, Apartment A14, Chelmsford, Massachusetts (hereinafter, "Target Location 3").  A complete description of the property to be searched is set forth in Attachment A-3, which is attached hereto and incorporated herein.

    d.      Collectively, Target Locations 1, 2, and 3 are referred to as the "Target Locations."

6.      As further discussed below, there is probable cause to believe that between August 2021 and October 2021, Elijah DECLET, a/k/a "Eli," a/k/a "Evil," ("DECLET"), Jaeby ORTIZ Ruiz ("ORTIZ"), Vando GVOZDAREVIC ("GVOZDAREVIC"), and others known and unknown conspired to distribute and possess with intent to distribute controlled substances, in

violation of 21 U.S.C. § 846. Further, there is probable cause to believe that 1) DECLET resides at Target Location 1 and keeps records and evidence of his drug conspiracy at Target Locations and 1 and 2; 2) ORTIZ resides at Target Location 2 and keeps records and evidence of his drug conspiracy with DECLET at Target Location 2; and 3) GVOZDAREVIC resides at Target Location 3 and keeps records and evidence of his drug conspiracy with DECLET at Target Location 3.

7.      As a result, I submit that there is probable cause to believe that the Target Locations contain records and other evidence of the following offenses:  (a) possession with intent to distribute and/or distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1); (b) use of a communications facility in the commission of controlled substances trafficking offenses, in violation of 21 U.S.C. § 843(b); (c) conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846; and (d) money laundering offenses, in violation of 18 U.S.C. §§ 1956, 1957 (collectively, the "Target Offenses").  More specifically, as will be discussed below, I submit that there is probable cause to believe that within the Target Locations there is evidence of the Target Offenses, as described in Attachments B-1. B-2, and B-3.

8.      I have personally participated in this investigation since at least October 2020.  I am familiar with the facts and circumstances of this investigation based upon: (a) my personal knowledge and involvement in this investigation; (b) my review of telephone and other records related to this investigation; (c) information provided to me orally and in writing by other law enforcement agencies; and (d) my experience and training as a criminal investigator.

9.      Because this affidavit is submitted for the limited purpose of establishing probable cause that evidence of criminal activity involving the Target Offenses is located at the Target Locations, I have not included each and every fact known to me or other law enforcement officers involved in this investigation.  Rather, I have included only those facts that I believe are sufficient to establish probable cause for the issuance of the requested search warrants.  All times herein are approximate.

## PROBABLE CAUSE

### Background of investigation

10.      Between October 2020 and November 2021, investigators of the NSGTF with the assistance of  the Massachusetts State Police North Shore Gang Unit ("MSP Gang Unit") have been targeting the Gangster Disciple street gang operating in the Greater Lawrence, Massachusetts area. During the course of this investigation, investigators identified DECLET as a Haverhill-based leader of the Gangster Disciples and supplier of illegal narcotics, including cocaine, fentanyl pills, and methamphetamine pills. Further, investigators conducted controlled purchases of cocaine, fentanyl pills, and methamphetamine pills from DECLET on August 13, 2021, August 30, 2021, September 10, 2021, October 6, 2021, and October 28, 2021. These controlled purchases are detailed below.

11.      On April 27, 2021, the Honorable Leo T. Sorokin signed an Order authorizing the interception of wire and electronic communications to and from DECLET's prior telephone, (978) 476-5812. Intercepted communications between April 28, 2021 and May 27, 2021 corroborate that DECLET is a drug distributor, that he resides at Target Location 1, and used his residence as a base of his drug operation. Intercepted communications further corroborated that DECLET

conspired to distribute narcotics with ORTIZ.

<u>August 13, 2021:  DECLET left Target Location 1 prior to selling cocaine and fentanyl pills to CW-1</u>

12.     On August 12, 2021, a cooperating witness ("CW-1")[1] sent text messages to DECLET, who was using (978) 387-8902, to arrange the purchase of 100 "blues" (slang, meaning oxycodone pills) and one ounce of "white" (slang, meaning cocaine). Based on my training and experience, illicitly sold oxycodone pills are often counterfeit and actually contain fentanyl. CW-1 and DECLET agreed to meet the following day for the deal. CW-1 had purchased drugs from DECLET in the past and had an outstanding drug debt owed to DECLET. Agents later confirmed that DECLET was using (978) 387-8902 after completing the controlled purchase on August 13, 2021. The text messages between CW-1 and DECLET are preserved.

13.     On August 13, 2021, CW-1 and DECLET exchanged text messages and agreed to meet at a market in Exeter, New Hampshire for the deal. These text messages are preserved. Prior to meeting CW-1, agents already knew that DECLET resided at Target Location 1 based on intercepted communications and physical surveillance. For example, on May 22, 2021, at 5:51 p.m., agents intercepted a call wherein DECLET ordered a pizza and directed the delivery to his

---

[1] CW-1 began cooperating with law enforcement in approximately August 2021. CW-1 has been arrested for various offenses including, but not limited to, resisting arrest, drug offenses, probation violations, burglary, and operating under the influence of drugs or alcohol. CW-1 has convictions for various offenses including, but not limited to, operating under the influence of drugs or alcohol, burglary, and drug offenses. CW-1 is cooperating for consideration in potential criminal charges and for monetary compensation. The information that CW-1 provided has been corroborated to the extent possible.  Law enforcement officers consider the information provided by CW-1 to be reliable.

apartment, specifying Apartment 39A, which is Target Location 1. Agents have also physically surveilled DECLET coming and going from the building of Target Location 1.

14.     Prior to the deal, agents established surveillance in the area of Target Location 1. At 12:21 p.m., agents observed a rented Nissan Rogue, bearing New York registration KDB5483 (the "Nissan Rogue") arrive outside Target Location 1. An unidentified female (believed to be DECLET's girlfriend) entered the Nissan Rogue, which departed the area. Agents did not maintain surveillance of the Nissan Rogue.

15.     Meanwhile, other agents searched CW-1 and CW-1's vehicle for contraband and money with negative results. Agents provided CW-1 with audio and video recording and surveillance devices and $2,200 in recorded agency funds to complete the deal (and pay towards an outstanding debt). Agents then surveilled CW-1 travel to the market in Exeter, New Hampshire.

16.     At 2:21 p.m., agents observed the Nissan Rogue arrive in the market's parking lot. DECLET was in the passenger seat and his girlfriend was driving. DECLET exited the Nissan Rogue and entered the front passenger seat of CW-1's vehicle. Inside the vehicle, DECLET removed a package of suspected narcotics from his pants pocket and placed it into a potato chip bag in CW-1's vehicle. CW-1 then provided DECLET with the $2,200 of recorded agency funds. After the deal, DECLET returned the Nissan Rogue and departed the area.

17.     CW-1 departed to a predetermined location and provided the package of drugs to agents. Agents again searched CW-1 and CW-1's vehicle for contraband and money with negative results. The package received from CW-1 contained one bag of approximately 30 grams of white powdery substance and 100 blue pills.  Based upon my training and experience, the appearance and packaging of the substances, and the facts leading up to its acquisition, I believe the white

powdery substance is cocaine and that the 100 blue pills are counterfeit oxycodone pills containing fentanyl.  The substances were sent to the DEA Northeast Regional Laboratory for analysis, which remains pending.

### August 30, 2021:  DECLET left Target Location 1 and sold methamphetamine pills to CW-1 outside Target Location 2

18.     On August 30, 2021, CW-1 received a text message from telephone number (718) 669-8284 stating, "Eli new number phone broke." CW-1 believed that DECLET provided a new telephone number because his prior telephone broke. CW-1 exchanged text messages with DECLET to purchase 250 "Addys" (slang, meaning Adderall pills). Based on my training and experience, illicitly sold Adderall pills are often counterfeit and actually contain methamphetamine. CW-1 and DECLET agreed to meet at a car wash in Haverhill later that night to complete the deal.  These text messages are preserved.

19.     Prior to the deal, agents searched CW-1 and CW-1's vehicle for contraband and money with negative results. Agents then provided CW-1 with audio and video recording and surveillance devices and $800 of recorded agency funds, $750 to purchase the 250 methamphetamine pills and $50 to pay towards an outstanding debt. Agents then surveilled CW-1 travel to the car wash in Haverhill.

20.     Agents also established surveillance in the area of Target Location 1 prior to the deal. At 8:43 p.m., agents observed the Nissan Rogue arrive outside Target Location 1. An unidentified female went back and forth twice from the Nissan Rogue to the sliding glass door that accesses Target Location 1. The Nissan Rogue then departed the area of Target Location 1. CW-1 sent a text message to DECLET inquiring how long he would take to arrive at the car wash. DECLET replied, "Just got to town bout to count em up for you." At 8:56 p.m., DECLET

redirected CW-1 by phone call and text message to "71 Jackson Street ext, Haverhill ma," the building of Target Location 2. Agents surveilled CW-1 to the area of Target Location 2.

21.     At 9:06 p.m., CW-1 arrived outside Target Location 2 and spoke with DECLET's girlfriend who was sitting in the parked Nissan Rogue.  Agents observed DECLET exit the building of Target Location 2 and approach the driver's side of CW-1's vehicle. DECLET provided CW-1 with a bag in exchange for the $800 of recorded agency funds. DECLET then entered the Nissan Rogue and departed the area.

22.     Following the deal, agents surveilled CW-1 to a predetermined meeting location where CW-1 provided investigators with the bag received from DECLET. Agents searched CW-1 and CW-1's vehicle for contraband and money with negative results. The bag received from CW-1 contained 200 counterfeit Adderall pills that field-tested positive for methamphetamine. The DEA Northeast Regional Laboratory confirmed that the 200 pills weighted 64 grams and contain methamphetamine. DECLET has been charged with distributing methamphetamine to CW-1 on this date and has an outstanding warrant for his arrest. *See* 21-cr-10204-GAO(s).  CW-1 was instructed to call DECLET because CW-1 had ordered 250 Adderall pills and only received 200. DECLET informed CW-1 that he would discount the outstanding 50 Adderall pills from CW-1's debt.

<u>September 10, 2021:  DECLET left Target Location 1 and sold methamphetamine pills to CW-1 outside Target Location 2</u>

23.     On September 5, 2021, CW-1 received a text message from DECLET, who was using (718) 669-8284 stating, "Want my last 800 adds for a cheap price I just want em gone – Gimmie 2200 I'll part with em I've been sitting on em only you and one other person grabs and my boy grabs like 7k at a time so I'm just sitting on these 800 staring at em." I believe that

DECLET was willing to sell 800 counterfeit Adderall pills to CW-1 at discount because only CW-1 and one other customer purchased them ("Want my last 800 adds for a cheap price I just want em gone - only you and one other person grabs."). CW-1 agreed to meet DECLET at a later date to purchase the 800 counterfeit Adderall pills for $2,200. As will be further explained below, I believe that DECLET's "boy" is ORTIZ. I believe that DECLET stated that ORTIZ obtained 7,000 counterfeit Adderall pills at a time ("My boy grabs like 7k at a time.").

24.     Through a series of calls and texts messages CW-1 and DECLET agreed to meet at Target Location 1 in the morning of September 10, 2021. DECLET later sent a text message, "Yea the 800 up the street it's at my boys crib I don't keep sh** home and my plug will be out of work 4:30 I just spoke to em." CW-1 replied, "Word is there another kid around that has a few hundred more…" DECLET replied, "Nah, I only go thru him don't trust anyone else…" I believe that DECLET informed CW-1 that the 800 counterfeit Adderall pills were nearby at ORTIZ's residence, Target Location 2, ("my boy's crib") because DECLET does not keep drugs at Target Location 1 ("I don't keep sh** home,") and that his source of supply (later identified as GVOZDAREVIC) was not available until after 4:30 p.m. ("my plug will be out of work 4:30."). CW-1 attempted to elicit if DECLET had another source of supply ("Is there another kid around?"). I believe that DECLET stated he only trusted GVOZDAREVIC as a source of supply ("I only go thru him don't trust anyone else."). These text messages are preserved.

25.     Prior to the deal, agents searched CW-1 and CW-1's vehicle for contraband and money with negative results. Agents then provided CW-1 with audio and video recording devices and $3,000 of recorded agency funds, $2,200 to purchase the 800 methamphetamine pills and $800 to pay towards an outstanding debt. Agents then surveilled CW-1 travel to Target Location 1.

26.     Agents also established surveillance in the area of Target Location 1 prior to the deal. At 11:07 a.m., agents observed DECLET exit the building of Target Location 1 and enter CW-1's vehicle. Agents then surveilled CW-1 and DECLET travel to the building of Target Location 2. During the drive, DECLET informed CW-1 that his source of supply was his "cousin." DECLET and CW-1 discussed the prices of counterfeit Adderall pills and whether DECLET had access to "football' shaped Adderall pills. CW-1 described to DECLET that these "football" shaped Adderall pills are more desirable.

27.     When CW-1 parked outside Target Location 2, DECLET informed CW-1 that Target Location 2 was "his boy's house."[2] DECLET exited CW-1's vehicle and entered the building of Target Location 2. Three minutes later, DECLET exited the building of Target Location 2 and re-entered CW-1's vehicle. CW-1 then drove away because DECLET said that the street was "hot," meaning that he noticed law enforcement vehicles in the area.

28.     Agents surveilled CW-1 travel back to the parking lot of Target Location 1. During the drive, DECLET provided CW-1 with a bag of counterfeit Adderall pills in exchange for the $3,000 of recorded agency funds. After CW-1 arrived outside Target Location 1, DECLET exited and agents observed him enter the building of Target Location 1.

29.     Following the deal, agents surveilled CW-1 to a predetermined meeting location where CW-1 provided investigators with the bag received from DECLET. Agents searched CW-1 and CW-1's vehicle for contraband and money with negative results. The bag received from CW-1 contained 800 counterfeit Adderall pills that field-tested positive for fentanyl and

---

[2] DECLET had previously informed CW-1 that Target Location 2 was his mother's house. Investigators do not believe that DECLET's mother lives at Target Location 2. Rather, I believe Target Location 2 is ORTIZ's residence.

methamphetamine.  The pills were sent to the DEA Northeast Regional Laboratory for analysis, which remains pending.

<u>Identification of ORTIZ and his residence at Target Location 2</u>

30.    ORTIZ was identified as DECLET's "boy" or associate through intercepted communications and law enforcement reports. On April 29, 2021, agents intercepted a call between DECLET and an unidentified male who was using (978) 476- 5812 ("UM-5812"). UM-5812 described a threat that he received from an anonymous sender, threatening to kill him, DECLET, and another associate. DECLET, trying to figure out who would have sent that message, replied, "I don't chill with no one. I chill with Jaeby, Gilly, and that's it. And Dante sometime." I believe that DECLET conveyed to UM-5812 that he had few associates, including Jaeby ORTIZ Ruiz, Gilly Vasquez, and an unidentified male, "Dante." DECLET continued, " I only chill with you when you come around, Jaeby, and Gilly, and my shorty." I believe that DECLET affirmed that he only associated with UM-5812 when he was in the area, ORTIZ, Vasquez, and his girlfriend ("my shorty"). DECLET appeared confused and irate that someone would threaten to kill him.

31.    On May 12, 2021, agents intercepted a call between DECLET and his girlfriend wherein they discussed an individual's jealousy towards DECLET. DECLET stated, "Babe, this n***a's mad because he sees me and Jaeby starting our own card brand, and guess what, guess what the plug just did last night? – He just gave me and Jaeby an account that gets 6,000 views and already has plays on it." I believe that DECLET explained to his girlfriend that this individual was jealous because DECLET and ORTIZ were starting their own drug business ("He sees me and Jaeby starting our own card brand."). I believe that DECLET explained to his girlfriend that he and ORTIZ inherited a social media account from their drug source ("the plug') that has 6,000

views and has an established drug customer base ("He just gave me and Jaeby an account that gets 6,000 views and already has plays on it.").

32.     In May 2021, investigators were monitoring the Snapchat accounts of DECLET and ORTIZ. DECLET's account depicted images of ORTIZ, corroborating their association.  In May 2021, both DECLET and ORTIZ's personal snapchat accounts advertised a Snapchat account bearing username "Pressure.Boyz.2x" That account had posts depicting DECLET and ORTIZ displaying drugs. Snapchat posts auto-delete after they are viewed and Snapchat notifies account holders if any content is screenshot or saved. Due to this feature, these Snapchat posts were not preserved.

33.     Further, CW-1 is familiar with ORTIZ and knows him as "JP" or "JB." CW-1 has smoked marijuana with DECLET and ORTIZ at least four times. CW-1 described the person he knew as "JP or "JB" as a short, skinny, light-skinned male, consistent with ORTIZ's appearance.

34.     The Registry of Motor Vehicles lists ORTIZ's residence as Target Location 2. On July 13, 2019, Haverhill Police responded to Target Location 2, which is the first floor of the building, for a reported burglary. Haverhill Police spoke to ORTIZ at Target Location 2, who stated that his sneakers and PlayStation controller were stolen in a burglary in the early morning hours of that day.

35.     I believe that DECLET and ORTIZ are operating a drug distribution business and that ORTIZ is DECLET's "boy" that stores narcotics at Target Location 2 so that DECLET does not have to store narcotics at Target Location 1. I believe that Target Location 2 will contain evidence, fruits, and instrumentalities of DECLET and ORTIZ's drug distribution operation.

October 6, 2021:  DECLET left Target Location 1 and sold methamphetamine pills to CW-1 received from GVOZDAREVIC outside Target Location 3

13

36. On October 4, 2021, CW-1 received a text message from DECLET, who was using (978) 764-3745 stating, "$1.90 on the footballs for 5K I got you!!!!" CW-1 agreed to meet DECLET at a later date to purchase $5,000 worth of counterfeit Adderall pills. On October 6, 2021, CW-1 and DECLET agreed to meet for CW-1 to purchase 1,500 counterfeit Adderall pills for $4,000. DECLET directed CW-1 to meet him outside Target Location 1 and that they would pick up the 1,500 Adderall pills together.

37. Prior to the deal, agents searched CW-1 and CW-1's vehicle for contraband and money with negative results. Agents then provided CW-1 with audio and video recording and surveillance devices and $4,000 of recorded agency funds. Agents then surveilled CW-1 travel to Target Location 1.

38. Agents also established surveillance in the area of Target Location 1 prior to the deal. At 9:38 p.m., agents observed DECLET exit the building of Target Location 1 and enter CW-1's vehicle. Agents then surveilled CW-1 and DECLET travel to the building of Target Location 3. During the drive, DECLET spoke to an unidentified male over the phone and stated that he would "be there in 23 minutes."

39. At 10:10 p.m., CW-1 parked outside Target Location 3. An individual later identified as GVOZDAREVIC approached the passenger side of CW-1's vehicle where DECLET was seated. GVOZDAREVIC handed DECLET two bags of pills. DECLET then handed GVOZDAREVIC a sum of his own money. DECLET then placed the pills into CW-1's center console and CW-1 departed the area. Agents surveilled GVOZDAREVIC return to the building of Target Location 3.

40.     Agents surveilled CW-1 travel back to the parking lot of Target Location 1. There, CW-1 provided DECLET with the $4,000 of recorded agency funds. DECLET stayed in CW-1's vehicle where he counted the money before he exited and entered the building of Target Location 1.

41.     Following the deal, agents surveilled CW-1 to a predetermined meeting location where CW-1 provided investigators with the bags received from DECLET and GVOZDAREVIC. Agents searched CW-1 and CW-1's vehicle for contraband and money with negative results. The bags received from CW-1 contained 1,513 counterfeit Adderall pills that weighed 505 grams and were confirmed to contain methamphetamine by the DEA Northeast Regional Laboratory.

### October 28, 2021:  DECLET left Target Location 1 and sold methamphetamine pills to CW-1 received from GVOZDAREVIC outside Target Location 3

42.     On October 28, 2021, CW-1 called DECLET, who was using (978) 764-3745, and arranged to purchase 1,600 methamphetamine pills for $3,600. CW-1 stated that he had an additional $400 for DECLET to apply towards CW-1's outstanding debt. DECLET directed CW-1 to meet him down the street from Target Location 1 and that they drive to DECLET's pill source together.

43.     Prior to the deal, agents searched CW-1 and CW-1's vehicle for contraband and money with negative results. Agents then provided CW-1 with audio and video recording and surveillance devices and $4,000 of recorded agency funds. Agents then surveilled CW-1 travel to the parking lot of Target Location 1.

44.     Agents also established surveillance in the area of Target Locations 1 and 3 prior to the deal. At 8:10 p.m., agents observed GVOZDAREVIC enter the passenger seat of a Honda accord, bearing Massachusetts registration 3GKN24, which is registered to GVOZDAREVIC's

girlfriend, M. Alicea and registered to Target Location 3 (the "Honda Accord"). The Honda Accord travelled back and forth to the building of Target Location 3 several times.

45.    At 8:37 p.m., agents observed CW-1 arrive in the parking lot of Target Location 1 and informed DECLET he was outside. DECLET informed CW-1 to meet him down the street. Agents then observed DECLET exit the building of Target Location 1 and enter into a rented Chevrolet hatchback. DECLET drove to CW-1 and briefly entered CW-1's vehicle. DECLET instructed CW-1 to follow him to his "cousin's house." As stated above, DECLET informed CW-1 that his source of supply was his "cousin." CW-1 then followed DECLET to the parking lot of Target Location 3 where they parked next to one another. CW-1 then provided DECLET with the $4,000 recorded agency funds. DECLET then drove to a different parking space in the same lot.

46.    At 9:21 p.m., agents observed GVOZDAREVIC descending the stairs from the direction of Target Location 3 and exit the building. GVOZDAREVIC went to DECLET's vehicle and the two had a brief meeting outside of DECLET's driver's side window. Agents then observed GVOZDAREVIC return to the building of Target Location 3 and ascend the stairs towards Target Location 3. Agents photographed and video recorded GVOZDAREVIC leaving and entering the building of Target Location 3.

47.    DECLET then returned to CW-1's vehicle and threw two sandwich bags full of pills into CW-1's vehicle. DECLET again informed CW-1 that he and GVOZDAREVIC were blood cousins and that GVOZDAREVIC would sell them a pill press if they continued buying pills from him. DECLET and CW-1 then parted ways in their respective vehicles.

48.    Following the deal, agents surveilled CW-1 to a predetermined meeting location where CW-1 provided investigators with the bags received from DECLET and GVOZDAREVIC.

Agents searched CW-1 and CW-1's vehicle for contraband and money with negative results. The bags received from CW-1 contained 1,599 counterfeit Adderall pills that field tested positive for methamphetamine. The pills were transported to the DEA Northeast Regional Laboratory, where analysis remains pending.

<u>Identification of GVOZDAREVIC and Target Location 3</u>

49.     Following the October 28, 2021 controlled purchase of methamphetamine pills, agents sought to identify GVOZDAREVIC as the individual who supplied the methamphetamine pills. Agents searched for and reviewed the social media page of M. Alicea, the registered owner of the Honda Accord. Alicea's social media page showed that she was in a relationship with an individual using the Facebook moniker, "East Side." Agents confirmed that photographs of "East Side" were of the individual who supplied the methamphetamine pills on October 6, 2021 and October 28, 2021.

50.     The Facebook account of a family member of "East Side" had a photograph that was also tagged with the name "Vando." Investigators searched the name "Vando" in law enforcement databases. A review of the Department of Corrections database showed the booking photograph of Vando GVOZDAREVIC, which also matched the photographs of "East Side," the individual tagged as "Vando" on Facebook, and photographs of GVOZDAREVIC coming and going from the building of Target Location 3 during the controlled purchase on October 28, 2021. GVOZDAREVIC was recently released from a five-year state prison sentence in July 2021 following convictions in Middlesex Superior Court for drug trafficking and firearm offenses. GVOZDAREVIC is currently on probation for that case.

51.     On November 2, 2021, an individual self-identified as GVOZDAREVIC called an investigator from the Methuen Police on the NSGTF and inquired why law enforcement had queried his name. GVOZDAREVIC stated that he was notified of the query by his probation officer, who provided him the phone number of the Methuen Police Department. The investigator, to preserve the secrecy of this investigation, stated he did not recall "running" GVOZDAREVIC's name. GVOZDAREVIC provided his telephone number and stated that he was living in Lowell, Massachusetts. GVOZDAREVIC asked the investigator to clear up the issue with his probation officer.

52.     The investigator then called GVOZDAREVIC's probation officer, who informed the investigator that GVOZDAREVIC was living with his girlfriend at 183 Moore Street, Floor 1, Lowell, Massachusetts. Agents learned through GVOZDAREVIC's probation officer that this address was M. Alicea's family address, confirmed through open-source searches to be M. Alicea's mother's address. M. Alicea had recently updated her address to Target Location 3 in March 2021. I believe that GVOZDAREVIC is now living with his girlfriend, M. Alicea, at Target Location 3 and reported M. Alicea's old residence to his probation officer in order to better conceal his drug distribution operation at Target Location 3. I believe that Target Location 3 contains evidence, fruits, and instrumentalities of DECLET and GVOZDAREVIC's drug distribution activities.

**Drug Traffickers' Use of Residences and Cell Phones Generally**

53.     Based upon my experience and the experience of other law enforcement officers who have participated in the execution of numerous search warrants at the residences of drug-

traffickers, I am aware that the following kinds of drug-related evidence have typically been recovered during searches of drug-traffickers' residences:

    a. Controlled substances.

    b. Paraphernalia and tools for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, presses, dies, and substances used to "cut" or dilute illegal narcotics.

    c. Books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, prescriptions; ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

    d. Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

    e. Cash, currency, and currency counting machines, and records relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

    f. Documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage facilities.

    g. Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the Target Location. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal

telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

h.   Photographs, videos, or other records concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

i.   Cellular telephones, and evidence that tends to identify the person having dominion and control over the cellular telephone, such as electronic address books or contact lists on the phone, call logs, saved text messages, saved usernames and passwords and documents.

54.   Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for drug traffickers to maintain in their residences records relating to their drug trafficking activities.

55.   Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.  Often drug traffickers keep ledgers or "pay and owe" records to show balances due for drugs sold in the past ("pay") and for payments expected ("owe") as to the trafficker's suppliers and the trafficker's dealers.  Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business.  I am also aware that drug traffickers often maintain such documents related to their drug trafficking activities at their residences for an extended period of time, regardless of whether they are physically in possession of drugs on the premises.

56.     Even when drug dealers store their drugs outside their residences, I know that they often will keep records relating to these offsite storage locations at their primary residence and/or their vehicle.  Such documents include rental or storage property agreements and receipts.

57.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am aware that it is generally a common practice for traffickers to conceal, at their residences or locations of operations, large sums of money, either proceeds from drug sales or monies to be used to purchase controlled substances.

58.     Furthermore, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances.  Drug traffickers also often maintain one or more currency counting machines to aid in counting their drug proceeds.  Many experienced drug traffickers will often engage in money laundering to conceal the source of their drug proceeds and will use proceeds to purchase legitimate investments or expensive jewelry and precious metals.  In other instances, drug traffickers will combine cash from their drug trafficking with cash deposits from other legitimate business activities in an attempt to hide their illegal conduct.  Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences.

59.     Based upon my training and experience, as well as the training and experience of other law enforcement agents I have worked with, I am also aware that drug traffickers generally try to hide cash and sensitive documents related to their drug trafficking and money laundering activities in safes or other containers so that other individuals who are at their residence do not discover these materials.

60.     During the course of residential searches, I and other agents have also found items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the Target Location.  It is common for drug traffickers to reside in locations that have utilities subscribed to in the names of friends, relatives, and/or significant others.  This is done in an effort to thwart law enforcement detection.  Evidence of occupancy, residency, rental and/or ownership of the premises is relevant to the prosecution of the Target Offenses.  Such identification evidence is typical of the articles people commonly maintain in their residences, such as cancelled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.  Furthermore, records of residency linking a person to a particular location are durable and are reasonably likely to be maintained for long periods of time for several reasons, such as record keeping.  Many documents and records are largely innocuous, or at least are perceived as such, while many documents and records have other utility.  For example, a person involved in the trade of controlled substances is unlikely to discard passports, licenses, titles to motor vehicles, bank books, address books, or bills.  These are necessary to prove ownership – even if they are in the name of a proxy – and they can be helpful when attempting to flee police.

61.     Based on my training and experience, I know that most drug dealers regularly use cellular telephones to communicate about their drug trafficking activities with customers, suppliers, and other coconspirators.  In my training and experience, I also am aware that drug traffickers are often aware of law enforcement's use of electronic surveillance, and thus frequently change cellular telephone numbers and/or use multiple cellular phones at the same time, as well as prepaid cellular phones (where the subscriber of the phone is not required to provide personal

identifying information), in an effort to thwart law enforcement's use of electronic surveillance. Because cellular telephones are often a principal means of communication, drug traffickers typically keep the phones in close proximity or at their residences.  Additionally, in my experience, many drug traffickers do not dispose of their cellular telephones when getting a new number, but instead just discard them in various locations in their residences.  As a result, it is common to recover not only paper records pertaining to the use of a cellular phone by drug traffickers, such as bills, call detail records, statements, and other documents, but the cellular telephones themselves, from drug traffickers' residences.

62.     Based upon my knowledge, training and experience, I know that a cellular telephone is a handheld wireless device used primarily for voice communication through radio signals.  These telephones send signals through networks of transmitter/receivers called "cells," enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones now offer a broad range of capabilities.  These capabilities include, but are not limited to: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and email; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.  Based on my training and experience, I know that many cellular telephones have the capabilities described above.

63.     Seizure of devices containing this information will provide information relating to coconspirators and accomplices.  I know, based upon my training and experience, as well as consultation with other investigators, that individuals who sell controlled substances typically use cellular telephones to communicate with their suppliers, their customers, and with other coconspirators, and that they communicate both via both voice calls and via email and/or text messaging.  I also know that drug traffickers regularly keep records of their illegal activities.  These records can include, but are not limited to, contact list of buyers and sellers, ledgers of sales and money owed by customers or to suppliers, and lists of quantities and/or specific controlled substances preferred by or ordered by specific customers.  Individuals engaged in drug trafficking activities often take photographs of their closest confederates.   Records of drug trafficking activities can be produced and maintained on paper in a tangible form and/or by electronic means on a cellular telephone.  From my training and experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachments B-1, B-2, and B-3 on their cellular telephones.

64.     Additionally, I know that many drug traffickers often use cellular telephones in order to communicate quickly and economically with their suppliers and customers via telephone, text messages, and the internet.  I am also aware that individuals frequently use cellular telephones to create and store records of their actions by communicating with others through e-mail, electronic messages, and updates to online social-networking websites; keeping their calendars; arranging for travel; storing pictures; researching topics related to drug trafficking; and accessing their bank, financial, investment, utility, and other accounts online.  Additionally, many cellular phones today have a GPS navigation device on the phone.  Examination of the GPS data on a cellular phone can

provide valuable evidence as to the locations where drug traffickers meet with coconspirators, including their sources of supply, and can aid in identifying those individuals. Additionally, review of GPS data can aid in identifying offsite locations where drug traffickers store drugs, maintain bank accounts, and conceal their drug proceeds.

65.     Based upon my training and experience, and information provided to me by others involved in the forensic examination of computers, I know that electronic data on cellular telephones can be stored in a variety of methods, including, but not limited to, within the memory of the cellular telephone; within volatile memory, such as RAM; or on removable media, such as memory cards. I also know that electronic data can often be recovered months or even years after it has been written, downloaded, saved, deleted, or viewed locally or over the internet. This is true because:

    a.   Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their electronic equipment, they can easily transfer the data from their old device to a new one.

    b.   Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a device, the data contained in the file often does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, the device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c.   Wholly apart from user-generated files, electronic storage media often contains electronic evidence of how the device has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation; file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but users typically do not erase or delete this evidence because special software is typically required for that task.

    d.   Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser on a cellular telephone often maintains a fixed amount of hard drive space devoted to

these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

66.     I know from my training and experience, that many cellular telephones now offer their users the ability to unlock the device via the use of a fingerprint in lieu of a numeric or alphanumeric passcode or password.  This feature is called a biometric lock.

67.     If a user enables the biometric lock, he or she can register fingerprint(s) that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's fingerprint sensor.  In my training and experience, users of biometric locks often enable it because it is considered to be a more convenient way to unlock the device than by entering a passcode, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

68.     In some circumstances, a fingerprint cannot be used to unlock a device that has a biometric lock enabled, and a passcode must be used instead. For example, if the device has not been unlocked for a period of time, or due to a periodic requirement to use the passcode.  Thus, in the event law enforcement encounters a locked smartphone device, the opportunity to unlock the device via the fingerprint sensor exists only for a short time.  A biometric lock may also not work to unlock the device if for example, (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) several unsuccessful attempts to unlock the device are made.

69.     I am also aware that even more recent smartphone devices no longer use a biometric lock and instead use a facial recognition security feature.  Facial recognition systems use the

smartphone's camera to scan the face of the user and, if the scan matches the data on file, performs actions like unlocking the smartphone.

70.     The passcodes that would unlock these devices are not known to law enforcement. Thus, it may be necessary to press the fingers of the user of the device to the device's fingerprint sensor or use the device's camera to access the facial recognition security feature in an attempt to unlock the device for the purpose of executing the search authorized by these warrants.  Attempting to the unlock device with the use of the fingerprints of the user or use the device's camera and take a scan of the user is necessary because the government may not otherwise be able to access the data contained on the device for the purpose of executing the search authorized by these warrants.

71.     Based on the foregoing, I believe there is probable cause to believe that evidence of the commission of the Target Offenses, more specifically, the items set forth in Attachments B-1, B-2, and B-3 will be found at the Target Locations described in Attachments A-1, A-2, and A-3.

## CONCLUSION

72.     Based upon the evidence set forth above, as well as my knowledge, training and experience, I submit that there is probable cause to believe that at the Target Locations, as described in Attachments A-1, A-2, and A-3 there exist evidence, fruits, and instrumentalities of drug distribution activities as set forth in Attachments B-1, B-2, and B-3.  Accordingly, I respectfully request that search warrants be issued for the search of the Target Locations.

73.     Disclosure of the contents of the applications, affidavit, and search warrants could compromise and jeopardize this ongoing investigation by allowing DECLET, ORTIZ, and GVOZDAREVIC to flee and/or destroy evidence.  For that reason, I request that the applications, affidavit, and search warrants be sealed until further order of the Court.

Respectfully submitted,

Dustin Poulin
Special Agent
Federal Bureau of Investigation

Attested and sworn to via telephone in accordance with Federal Rule of Criminal Procedure 4.1 on November 9, 2021.

Hon. Marianne B. Bowler
United States Magistrate Judge
District of Massachusetts

**ATTACHMENT A-1**

**(Location to be searched)**

39 Forest Acres Drive, Apartment 39A, Haverhill, Massachusetts ("Target Location 1")

is an apartment within a multi-unit residential building.

Target Location 1 is on the first floor of the building and has "39A" affixed to the

apartment door leading into the residence to be searched. Target Location 1 is also accessible

through a sliding glass door that is circled in red below. Photographs of the sliding glass door at

Target Location 1 and the apartment door from the interior of the building are attached.




**ATTACHMENT A-2**
**(Location to be searched)**

71 Jackson Street Extension, Apartment 1, Haverhill, Massachusetts ("Target Location 2") is the first-floor apartment within a two-family residential building.

Target Location 2 is on the first floor of the building and the only unit on that floor. Target Location 2 is accessible after accessing the building's door and entering into a small common hallway area. A photograph of the building is attached.



**ATTACHMENT A-3**
**(Location to be searched)**

96 Richardson Road, Apartment A14, Chelmsford, Massachusetts ("Target Location 3")

is an apartment within a multi-unit residential building.

Target Location 3 has "14" affixed to the apartment door leading into the residence to be

searched. Target Location 3 is accessible through the front door of 96 Richardson Road, Building

A, up one-half flight of stairs up from the building's door, through a glass fire door, and is on the

left-hand side of the hallway. Photographs of the building, stairs taken from the building's door,

and the apartment door from the interior of the building are attached.

  

**ATTACHMENT B-1**

**(Items to be seized from Target Location 1)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses"):

1.   From May 2021 to the present, books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

2.   Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

3.   Cash, currency, and currency counting machines, and records from May 2021to the present, relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

4.   From May 2021 to the present, documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage units.

5.   From May 2021 to the present, items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain

in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

6. Photographs or videos concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

7. Cellular telephones, computers, and other electronic storage media belonging to or used by Elijah DECLET, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any electronic storage media, including but not limited to:

    a. Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

    b. From May 2021 to the present, logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

    c. From May 2021 to the present, text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

    d. From May 2021 to the present, information involving the travel to obtain controlled substances or the transportation of controlled substances

    e. From May 2021 to the present, incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

    f. From May 2021 to the present, GPS data;

    g. From May 2021 to the present, browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

h.    From May 2021 to the present, documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

i.    All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

j.    Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

During the search of the Target Location described in this warrant, law enforcement personnel are authorized to press the fingers (including thumbs) of Elijah DECLET to the fingerprint sensor of the device found at the Target Location and/or use the camera of the cellular telephone to scan the face of Elijah DECLET for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

# ATTACHMENT B-2

## (Items to be seized from Target Location 2)

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses"):

1.      Paraphernalia and tools for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, presses, dies, and substances used to "cut" or dilute illegal narcotics.

2.      From May 2021 to the present, books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

3.      Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers.  Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

4.      Cash, currency, and currency counting machines, and records from May 2021to the present, relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

5.      From May 2021 to the present, documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes, stocks, bonds, mutual funds, and any other financial and/or monetary assets,

instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage units.

6. From May 2021 to the present, items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

7. Photographs or videos concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

8. Cellular telephones, computers, and other electronic storage media belonging to or used by Jaeby ORTIZ Ruiz, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any electronic storage media, including but not limited to:

   a. Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

   b. From May 2021 to the present, logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

   c. From May 2021 to the present, text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

   d. From May 2021 to the present, information involving the travel to obtain controlled substances or the transportation of controlled substances

   e. From May 2021 to the present, incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

   f. From May 2021 to the present, GPS data;

g.     From May 2021 to the present, browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

h.     From May 2021 to the present, documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

i.     All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

j.     Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

During the search of the Target Location described in this warrant, law enforcement personnel are authorized to press the fingers (including thumbs) of Jaeby ORTIZ Ruiz to the fingerprint sensor of the device found at the Target Location and/or use the camera of the cellular telephone to scan the face of Jaeby ORTIZ Ruiz for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

**ATTACHMENT B-3**

**(Items to be seized from Target Location 3)**

All records, in whatever form, and tangible objects that constitute evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with intent to distribute controlled substances), 843(b) (use of a communication facility during or in relation to a controlled substances trafficking offense), and 846 (conspiracy to distribute and possess with intent to distribute controlled substances); and/or 18 U.S.C. §§ 1956, 1957 (money laundering offenses) (collectively, the "Target Offenses"):

1.      Controlled substances, including methamphetamine pills.

2.      Paraphernalia and tools for packaging, processing, diluting, weighing, and distributing controlled substances, including but not limited to, plastic bags, heat-sealing devices, scales, funnels, sifters, grinders, glass panes, mirrors, razor blades, presses, dies, and substances used to "cut" or dilute illegal narcotics.

3.      From May 2021 to the present, books, records, receipts, notes, ledgers, and other papers relating to the purchase, storage, or distribution of controlled substances. Such documents include, but are not limited to, ledgers; text or email messages from or to suppliers, customers or associates pertaining to the transportation, ordering, sale, and distribution of controlled substances or the disposition of proceeds; bank records; money orders; wire transfers; cashier's checks; checkbooks; passbooks; certificates of deposit; airline travel records; vehicle rental receipts; credit card receipts; and receipts reflecting rental properties and/or storage units.

4.      Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the identity and contact information for co-conspirators, drug suppliers, and drug customers. Such documents include, but are not limited to, telephone address books; planners; notes; ledgers; and telephone bills.

5.      Cash, currency, and currency counting machines, and records from May 2021to the present, relating to controlled substances income and financial transactions relating to obtaining, transferring, laundering, concealing, or expending money or other items of value made or derived from trafficking in controlled substances. Such items include, but are not limited to, jewelry; precious metals such as gold and silver; precious gems such as diamonds; titles; deeds; monetary notes; registrations; purchase or sales invoices; and bank records.

6.      From May 2021 to the present, documents or tangible evidence reflecting dominion, ownership, and/or control over any bank accounts, safe deposit boxes,

stocks, bonds, mutual funds, and any other financial and/or monetary assets, instruments or interests, and over any tangible assets such as motor vehicles, real property, and commercial storage units.

7.    From May 2021 to the present, items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, bank statements, credit card receipts, identification documents, and keys.

8.    Photographs or videos concerning controlled substances, proceeds from the sales of controlled substances, or identities of coconspirators.

9.    Cellular telephones, computers, and other electronic storage media belonging to or used by Vando GVOZDAREVIC, and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering, located in the memory of any electronic storage media, including but not limited to:

a.    Names and contact information that have been programmed into the device(s) (including but not limited to contacts lists) of individuals who may be engaged in drug trafficking or money laundering;

b.    From May 2021 to the present, logs of calls (including last numbers dialed, last calls received, time of calls, missed calls, and duration of calls) both to and from the device(s);

c.    From May 2021 to the present, text messages both sent to and received from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering and/or referencing individuals engaged in drug trafficking or money laundering;

d.    From May 2021 to the present, information involving the travel to obtain controlled substances or the transportation of controlled substances

e.    From May 2021 to the present, incoming and outgoing voice mail messages both to and from the device(s) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

f.    From May 2021 to the present, GPS data;

g.      From May 2021 to the present, browser messages and/or internet communications (e.g., e-mail, text messages) both to and from the device(s) (including any in draft form) relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

h.      From May 2021 to the present, documents, photographs, or videos in any format, including but not limited to Microsoft Word or Adobe PDF files, relating to or referencing drug trafficking or money laundering or individuals engaged in drug trafficking or money laundering;

i.      All data within the device(s) evidencing ownership, possession, custody, control, or use of the device(s); and

j.      Service Provider handset unlock password(s) and any other passwords used to access the electronic data described above.

During the search of the Target Location described in this warrant, law enforcement personnel are authorized to press the fingers (including thumbs) of Vando GVOZDAREVIC to the fingerprint sensor of the device found at the Target Location and/or use the camera of the cellular telephone to scan the face of Vando GVOZDAREVIC for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.